## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re    JOHN N. IRWIN and<br>JACKLIN ASSOCIATES, INC.,<br><br>Debtors. | :   Case Nos. 10-14407 and 10-14408<br>:<br>:   JOINTLY ADMINISTERED under<br>:   Chapter 11<br>:<br>:<br>: |
| MARION A. HECHT, as Receiver for Joseph<br>Forte, L.P.,<br><br>                Plaintiff,<br><br>v.<br><br>JOHN N. IRWIN<br><br><br>              Defendant. | :<br>:   Adversary Proc. No. _____<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Marion A. Hecht (the "Receiver"), as the Court-appointed Receiver for Joseph Forte, L.P. (the "Partnership"), by and through her counsel, Hoyle, Fickler, Herschel and Mathes, LLP, for her Complaint against John N. Irwin ("Irwin"), based on actual knowledge and information and belief, states as follows:

## NATURE OF PROCEEDING, JURISDICTION, AND VENUE

1.      This is an adversary proceeding to determine the dischargeability of certain debts owed by Irwin to the Receiver as a result of his conduct associated with a Ponzi scheme that caused the Partnership to incur over $34 million in losses.

2.      This adversary proceeding is related to *In re John N. Irwin*, a Chapter 11 case docketed as 10-14407 in the United States Bankruptcy Court for the Eastern District of

Pennsylvania, and *In re Jacklin Associates, Inc.*, a Chapter 11 case docketed as 10-14408 in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Pursuant to the Court's Order dated June 30, 2010, cases 10-14407 and 10-14408 are Jointly Administered.

3.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## PARTIES AND PROCEDURAL HISTORY

4.    Defendant Irwin is a Debtor in this Jointly Administered Chapter 11 case. On information and belief, Irwin is, and at all times relevant to this Complaint was, the president and majority shareholder of Jacklin Associates, Inc. ("Jacklin"), the other Debtor in this Jointly Administered case.

5.    Plaintiff Marion A. Hecht was appointed Receiver of the Partnership on March 30, 2009 by the Honorable Paul S. Diamond of the United States District Court for the Eastern District of Pennsylvania. The Court's Receivership Order requires Ms. Hecht to "assume control of, marshal, pursue, and preserve" the "assets, monies, securities, choses in action, and properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated, of [the Partnership and Forte]," "with the objective of maximizing the recovery of defrauded investors and, to the extent that the assets recovered may be inadequate to make them whole, ensuring that the distribution of those assets is as just and equitable as practicable." Order Appointing a Receiver, entered on March 30, 2009 in *SEC v. Forte*, 09-cv-0063 (E.D. Pa.) and *CFTC v. Forte*, 09-cv-0064 (E.D. Pa.) (the "Receivership Order," attached hereto as Exhibit A).

6.    The Receiver is a creditor of Irwin, and is identified as such in Schedule F to

Irwin's Chapter 11 petition, which notes that the Receiver's claim arises from a "Complaint" and characterizes the Receiver's claim as "unliquidated" and "disputed."

7.　　The Receiver's claim against Irwin was initially set forth in a Complaint filed by the Receiver, in her capacity as Receiver for Joseph Forte, L.P., on March 29, 2010 captioned *Marion A. Hecht, as Receiver for Joseph Forte, L.P. v. John N. Irwin and Jacklin Associates*, which was assigned docket number 10-cv-1371 in the United States District Court for the Eastern District of Pennsylvania (the "District Court Action"). That Complaint, filed by the Receiver as part of her continuing duty to "assume control of, marshal, pursue, and preserve" the assets of the Partnership (Receivership Order ¶ II), included, among others, causes of action for fraud, aiding and abetting fraud, and breach of fiduciary duty against Irwin. The Receiver sought from Irwin at least $34 million dollars in damages caused to the Partnership by Irwin's wrongful conduct.

8.　　The District Court Action is currently stayed pursuant to 11 U.S.C. § 562 following the Debtors' initiation of proceedings before this Court on May 27, 2010, at which time a motion to dismiss the Receiver's Complaint filed jointly by Irwin and Jacklin was pending in the District Court Action. The District Court subsequently, on July 2, 2010, denied the pending motion to dismiss without prejudice "pending the resolution" of the bankruptcy proceedings.

## BACKGROUND

9.　　The Receiver's claims against Irwin are based upon his involvement in a Ponzi scheme operated by Joseph S. Forte between 1995 and 2008 through the Partnership, a commodity trading pool Forte established with Irwin. Forte's Ponzi scheme was remarkably simple. Each month, Forte reported false gross investment earnings, interest returns, and

expenses to Irwin through an informal email. In the first few years of the Partnership, Forte

provided some non-standard year-end supporting documentation, but from 2002 through 2008,

Forte provided no documents to support his informal email reports of investment returns. Using

the information in Forte's emails, Irwin then prepared reports to investors and tax filings for

investors. These documents were all fraudulent and were utilized by Forte and Irwin to promote

the Partnership and recruit new investors. Through this fraudulent scheme, Forte, Irwin, and

Jacklin raised over $78 million for the Partnership and defrauded investors in the Partnership out

of approximately $34 million. After nearly fourteen years of operating the fraudulent Ponzi

scheme, Forte turned himself in to authorities on or about December 22, 2008.

10.    On January 7, 2009, the Securities and Exchange Commission and the

Commodity Futures Trading Commission initiated proceedings in *SEC v. Forte*, Civ. A. No. 09-

CV-00063 (E.D. Pa.) (the "*SEC Action*"), and *CFTC v. Forte*, Civ. A. No. 09-CV-00064 (E.D.

Pa.) (the "*CFTC Action*") (collectively the "*SEC and CFTC Actions*"), and immediately obtained

preliminary injunctions against Forte to freeze his and the Partnership's assets. Subsequently, on

September 30, 2009, Partial Final Judgment as to All Defendants was entered by the Court in 09-

cv-0063, and a Consent Order of Permanent Injunction and Other Equitable Relief Against

Defendant Joseph S. Forte was entered by the Court in 09-cv-0064.

11.    On March 30, 2009, the Court issued the Receivership Order appointing Marion

A. Hecht as Receiver to oversee the recovery of Forte's and the Partnership's assets for

distribution to investors in the Partnership. As Receiver, Ms. Hecht was charged with, among

other things, the collection and distribution of assets Forte misappropriated through his Ponzi

scheme and the prosecution of any claims the Partnership has against others for the recovery of

Partnership assets, including those against "investors in the Limited Partnership." Receivership

Order ¶ X.P.

12.　　Until the appointment of the Receiver on March 30, 2009, Forte acted as the

General Partner of the Partnership and completely controlled and dominated the Partnership,

including with respect to the Partnership's ability to bring legal claims.

13.　　On June 5, 2009, in the related criminal action, *United States v. Forte*, No. 09-cr-

304-1 (E.D. Pa.), Forte pleaded guilty to charges of wire fraud in violation of 18 U.S.C. § 1343,

mail fraud in violation of 18 U.S.C. § 1341, bank fraud in violation of 18 U.S.C. § 1344, and

money laundering in violation of 18 U.S.C. § 1397, and Forte was subsequently sentenced to,

among other things, 180 months (15 years) imprisonment and the payment of restitution of

approximately $35 million.

## STATEMENT OF FACTS

### IRWIN, JACKLIN & FORTE CREATE THE LIMITED PARTNERSHIP

14.　　On or about the beginning of 1995, Forte, who knew Irwin from their membership

in the Rotary Club, represented to Irwin that he had developed a program for successfully trading

in commodities futures, but lacked the financial resources to do so.

15.　　At that time, Forte, who had been a gym owner and a computer salesman with

little experience in the area of financial investment, was facing unemployment.

16.　　Irwin suggested that an investment fund be created so that Forte could utilize his

investment trading program.

17.　　Irwin and Forte agreed to create the Partnership, with Forte as the general partner

and with Irwin, who agreed to invest $25,000 in the Partnership, as one of the first two limited

partners.

18.　　Irwin and Forte also persuaded a client of Irwin and Jacklin to invest $25,000 and

to become the second initial limited partner

19.     Prior to February 28, 1995, Irwin obtained the legal services of an attorney who prepared the documents necessary to form the Partnership, including the Limited Partnership Agreement and the Limited Partnership Certificate required to be filed with the Secretary of State of the Commonwealth of Pennsylvania.

20.     Irwin and Forte, together with Irwin and Jacklin's client, executed the Limited Partnership Agreement that established the Partnership on or about February 28, 1995.  The articulated purpose of the Partnership was to form a fund to invest in "securities futures."  See Limited Partnership Agreement for Joseph Forte, L.P. dated Feb. 28, 1995 (produced by Irwin and assigned bates numbers JI 3269-77) (attached hereto in redacted form as Exhibit B).[1]

21.     The Limited Partnership Agreement designated Forte as the General Partner and required limited partners to contribute at least $10,000 in capital per partnership unit.

22.     Under the Limited Partnership Agreement, Forte, as General Partner, was to be paid a management fee of one-half of one percent of the capital of the Partnership on a quarterly basis and incentive fees ranging from twenty to fifty percent of the net income of the Partnership for quarters in which the Partnership earned profits in excess of three percent.

23.     On March 10, 1995, the law firm that Irwin had retained to set up the Partnership sent Irwin a letter transmitting the Limited Partnership Certificate and requesting him to have Forte sign it; Irwin instructed Forte to send a check to the law firm.  See Letter from law firm to John N. Irwin dated Mar. 10, 1995 (produced by Irwin and assigned bates number JI 3311) (attached hereto in redacted form as Exhibit C).

---

[1] In order to preserve the privacy and confidentiality interests of investors and prospective investors in Forte's Ponzi scheme other than Mr. Irwin and his associated entities, the Receiver has redacted those investors' names from documents attached to this Complaint.  To the extent that such investor s are mentioned in the allegations of this Complaint, each investor is referred to by his, her, or its assigned investor number.

24.     Pursuant to the instructions Forte received from Irwin, Forte executed the

Certificate of Limited Partnership on March 24, 1995, and he filed it on April 3, 1995, with the

Secretary of the Department of State of Pennsylvania.

25.     In connection with the establishment of the Partnership, Irwin and Forte agreed

that for the calendar year 1995, Jacklin would pay Forte a monthly salary of $4,000 plus benefits

to organize and manage the Partnership.  Irwin and Forte also agreed that, in consideration of

employing Forte to organize and manage the Partnership, Jacklin would receive (a) a 50% share

of all fees Forte received as General Partner of the Partnership until Jacklin's expenses incurred

under the agreement with Forte were recouped and (b) a 15% share of all of Forte's fees

thereafter.  See Agreement between Forte and Jacklin for Calendar Year 1995 (produced from

Irwin's files by his counsel and assigned bates number Brotman.R 000005) (attached hereto as

Exhibit D).

26.     Pursuant to their agreement, Jacklin paid Forte's salary and related costs from

1995 until September 15, 1998.

27.     Furthermore, Irwin personally loaned Forte $10,000 at the end of 1995.

28.     In addition, in late 1995 Irwin assisted Forte in obtaining, and co-signed for, a

loan to Forte for $50,000 from a client of Irwin and Jacklin's – the same individual who, as

alleged above, had invested $25,000 to become the second limited partner in the Partnership.

29.     As reflected in a September 15, 1998, memorandum from Irwin to Forte "Re:

Salary vs. Fees," by at least the end of the fourth quarter of 1998, Jacklin had recouped all the

payments for salary and benefits that Jacklin had paid to Forte in connection with the startup of

the Partnership.

30.     Irwin publicly represented that Jacklin was a consulting firm of which he was

President; that he was a Certified Public Accountant who served as director and chief financial officer of several privately owned companies; and further that he "has extensive experience in guiding early stage enterprises to profitability." See Reflective Learning, Key Officers, http://reflectivelearning.com/officers.htm (visited on Dec. 29, 2009) (attached hereto as Exhibit E).

31.    Irwin's initial investment of $25,000, combined with his public claims about his and Jacklin's experience, lent credibility to the Partnership.

32.    As a result of the assistance provided to Forte by Irwin and Jacklin, the Partnership had the appearance of a legitimate commodity trading pool and therefore was able to obtain $78 million in investments.

**IRWIN AND JACKLIN WERE ACCOUNTANTS FOR THE PARTNERSHIP**

33.    While the Limited Partnership Agreement designated Beucler, Kelly & Irwin, Ltd. as accountant for the Partnership, Beucler, Kelly & Irwin, Ltd. never provided accounting services or any other services to the Partnership. In fact, Irwin performed all support and accounting activities for the Partnership through Jacklin.

34.    Irwin and Forte prepared an Amended Limited Partnership Agreement on or around July 1, 2000. See Amended Limited Partnership Agreement for Joseph Forte, L.P. dated July 1, 2000 (produced from Irwin's files and assigned bates numbers JI 4269-79) (attached hereto as Exhibit F).

35.    The Amended Limited Partnership Agreement allocates responsibility for the selection of an accountant for the Partnership jointly to Irwin and Forte.

36.    Irwin and Forte never selected an independent accountant to serve as the accountant for the Partnership.

37.    Instead, to the extent that accounting services were performed for the Partnership, they were performed by Irwin.

38.    Each month, Forte reported gross investment earnings, interest returns, and expenses to Irwin without providing supporting documentation.

39.    Using the information supplied by Forte, and without undertaking any effort to substantiate that information, Irwin and Jacklin prepared the account statements for the Partnership and sent them to limited partners.

40.    From 1995 through 2001, Forte provided false investment account documents to Irwin that purported to be 1099B forms from the Partnership's brokerage firm.

41.    Each of these purported 1099B forms was identified as a "substitute statement" and did not resemble any 1099B statements that Irwin had seen before.

42.    The investment earnings reflected in the purported 1099B form for 1995 that Forte provided to Irwin did not match the investment earnings Forte had reported to Irwin for that year.  A handwritten annotation on the purported 1995 1099B form states that the "difference [is] on JF personal," and Irwin was not provided with, and recklessly failed to request, documents in support of the investment earnings on Forte's personal account.

43.    When Forte stopped sending to Irwin the purported 1099B forms as year-end support for the numbers he had been reporting, Irwin recklessly failed to request such documents either from Forte or the institutions themselves.

44.    Irwin produced statements of income and change in capital for the investors based on the fraudulent quarterly earnings and expense statements for the Partnership transmitted by Forte to Irwin.

45.    Using the information supplied by Forte, and without undertaking any effort to

substantiate that information, Irwin and Jacklin recklessly prepared the tax returns for the

Limited Partnership together with the K-1 reports for the limited partners.

46.    The account statements for the Partnership and the tax report forms for the

Partnership and the limited partners prepared by Irwin and distributed by Jacklin and Forte were

fraudulent.

47.    The preparation of account statements and tax reports for the Partnership and the

limited partners constituted the rendering of professional accounting services to the Partnership

by Irwin and Jacklin.

48.    At the end of each year from 1995 through 2000, Irwin sent annual earning

statements to limited partners.  Each statement reported fraudulent earning and asset information.

49.    From 2001 through 2008, Irwin sent quarterly earning statements to limited

partners at the end of each fiscal quarter.  Each statement reported fraudulent earning and asset

information.

50.    Irwin and Jacklin produced annual tax forms for limited partners recording

earnings that were, in fact, fictional and fraudulent for each year from 1995 through 2007.

51.    Irwin and Jacklin are identified as the paid preparer on the Partnership's tax form,

and in that capacity prepared the tax forms relating to individual limited partners, including

statements of each partner's share of income, to be utilized in the limited partners' tax filings.

52.    Irwin and Jacklin, in addition to preparing statements and tax forms for investors,

determined Forte's (and therefore Jacklin's) fees based on Forte's fraudulent earnings

statements.

53.    In late 2002 or early 2003, Irwin listed himself as the Partnership's contact for

both "Partnership Valuation Information," and "Unrelated Business Taxable Income Data" on a

Sponsor Contact Information Form for the Trustee Services Department for Deutsche Bank.  See

Sponsor Contact Information datasheet (produced from Irwin's files and assigned bates

numbersSee JI 1236-37) (attached hereto in redacted form as Exhibit G).

### IRWIN AND JACKLIN SOLICITED INVESTMENTS IN THE PARTNERSHIP AND ACTED AS AGENTS FOR THE PARTNERSHIP VIS-À-VIS THE LIMITED PARTNERS

54.    In addition to managing the Partnership accounting through Jacklin, Irwin was the

primary contact for many investors throughout the existence of the Partnership.  Irwin's role with

respect to these investors included, *inter alia*, solicitation of their investments in the fund, receipt

and processing of their investments, arranging for and delivering withdrawals from the

Partnership, preparing tax documents, and communicating with limited partners regarding fund

performance.

55.    Forte and Irwin used the fraudulent account statements for the Partnership

prepared by Irwin and distributed by Jacklin to promote the Partnership and recruit new

investors.

56.    Irwin solicited investments in the Partnership from the beginning of the

Partnership through 2008, and in so doing made or repeated fraudulent statements.  For example:

a.    In or around November, 2000, Irwin represented to a prospective investor that he

handled the paperwork, legal agreements, accounting and financial review for the

Partnership.  On November 20, 2000, Irwin then sent a copy of the Limited

Partnership agreement to a prospective investor and instructed that, "[s]hould you

decide to invest, please sign one page and return it to me, together with your

check payable to Joseph Forte, L.P.," and requested that the prospective investor

call him if he has "any questions on the agreement."  The prospective investor and

his wife jointly became Limited partner #1088 on or about March 9, 2001.

Limited partner #1088 confirmed the investment in a note stating, "[a]s discussed

with Mr. Irwin on the telephone today." See Memo from John Irwin to Investor

#1088 dated Nov. 20, 2000 (produced from Irwin's files and assigned bates

number JI 1364) and Handwritten note from Investor #1088 dated Mar. 9, 2001

(produced from Irwin's files and assigned bates number JI 1333) (collectively

attached hereto in redacted form as Exhibit H).

b.  On August 8, 2002, Irwin sent a summary income statement for the Partnership to

another prospective investor.  In that letter, Irwin reported that, "[t]he Partnership

has been in existence since 1995 and the returns have ranged from 29% to 36% on

an annualized basis," and described Forte's trading system as "based upon

channels derived from proprietary computer programs." See Letter from John N.

Irwin dated Aug. 8, 2002 (produced from Irwin's files and assigned bates number

JI 5084) (attached hereto in redacted form as Exhibit I).

c.  In January or February, 2007, Irwin sent out a communication to a potential new

investor stating that "[w]e are accepting new investors at the present time.  Should

you be interested you can send a check made out to Joseph Forte, LP and mail it

to me . . . ."  This communication included a copy of the partnership agreement, a

summary statement of Partnership income for 2006, a breakdown of the tax

allocation of the partnership income, and an instruction that further questions

should be directed to Irwin via email. See Email from John N. Irwin dated Feb. 1,

2007 (produced from Irwin's files an assigned bates number JI 0426) (attached

hereto in redacted form as Exhibit J).

57.    From 1995 through 2008, limited partners would contact Irwin to request

withdrawals from their accounts, would send checks for deposit into the fund directly to Irwin,

and would receive their withdrawals directly from Irwin.  For example:

   a.  On March 15, 2005, Irwin sent Forte an email in which he requested a check from

       the Partnership payable to him (Irwin) because he gave a limited partner funds

       from "my own account because she needed immediate funds."  See Email from

       John N. Irwin to Joseph Forte dated Mar. 15, 2005 (assigned bates number J.F.

       PROD 1522) (attached hereto in redacted form as Exhibit K).

   b.  On more than one occasion the Partnership made a check out to Jacklin to fund

       withdrawals from multiple Partnership accounts by several distinct limited

       partners.  Irwin would deposit the check into Jacklin's account and then transfer

       the funds from Jacklin's account to the limited partners.  For example, on April

       10, 2008, the Partnership issued a check payable to "Jacklin Associates" for

       $220,000 with annotations allocating the total among John N. Irwin, the Irwin

       Irrevocable Trust, and investors ##1082, 1095, and 1116.  See Photocopy of

       Joseph Forte L.P. Check 1316 with handwritten annotation (a document attached

       to Irwin's response to an SEC Investor Questionnaire and assigned bates number

       IQ 898) (attached hereto as Exhibit L).

58.    Irwin arranged for and oversaw a lawyer's preparation of a trust account for at

least one investor's Partnership account and directed the lawyer to bill the Partnership for his

services.  See Memo from John Irwin to lawyer dated Nov. 16, 2000 (produced from Irwin's

files and assigned bates number JI 4753-54) (attached hereto in redacted form as Exhibit M).

59.    Many limited partners' communications regarding the Partnership treated Forte

and Irwin interchangeably as managers of their Partnership accounts.

## IRWIN AND JACKLIN EMPLOYED FORTE'S APPRENTICES WHO PURPORTEDLY WERE LEARNING FORTE'S INVESTMENT METHODS

60.      Beginning in 2000 and continuing through 2008, Forte and Irwin, through Jacklin, employed apprentices who were to be trained by Forte in his investment methods.

61.      These three individuals, William W. Hooper, Edmund F. Coll, and James P. Boudwin (jointly "the Apprentices"), were paid by Jacklin and received W-2 forms from Jacklin.

62.      The Apprentices were employed to reassure investors that the Partnership would survive beyond Forte's involvement.

63.      Each of the Apprentices worked as an apprentice for more than five years.

64.      Each of the Apprentices was instructed by Forte concerning his investment methods.

65.      During their employment, not one of the Apprentices was able to replicate Forte's reported results using his investment methods.

66.      As the employer of the Apprentices, Irwin knew or was reckless in failing to know that the Apprentices were unable to replicate Forte's reported results using his investment methods.

67.      Notwithstanding the Apprentices' lack of success in replicating Forte's reported results using his investment methods, on several occasions Irwin and Jacklin awarded and paid bonuses to them.

## IRWIN AND JACKLIN WILLFULLY IGNORED, RECKLESSLY DISREGARDED, OR CAST A BLIND EYE ON THE NUMEROUS SIGNS THAT INDICATED FORTE WAS RUNNING A PONZI SCHEME

68.      Irwin willfully ignored, recklessly disregarded, or cast a blind eye on the numerous signs that indicated Forte was running a Ponzi scheme.

69.    Forte reported fictional profits to Irwin every quarter from 1995 through 2008 with reported annual returns of between 18 and 38 percent. These returns were unrealistic and should have alerted Irwin and Jacklin that Forte was reporting fraudulent earnings.

70.    For many of the years from 1995 through 2008, Forte failed to provide any kind of documentation to Irwin and Jacklin for the earnings that he reported.

71.    For those years in which Forte did provide purported 1099B documents in support of the earnings he reported, the documents provided were not in the form of standard 1099B reports.

72.    Forte's unrealistic returns combined with the lack of documentation and/or non-standard documentation should have alerted Irwin and Jacklin that Forte was reporting fraudulent earnings.

73.    Irwin knew that he, through Jacklin, was the only individual providing accounting services to the Partnership and that no one besides Forte had access to or had reviewed documents supporting Forte's earnings reports, the Partnership's assets, and the Partnership's investment practices. The refusal of Forte to engage an independent third party administrator should have alerted Irwin and Jacklin that Forte was reporting fraudulent earnings.

74.    Irwin and Jacklin prepared tax documents for the Partnership and its limited partners without standard documentation. From 1995 through 2001, Forte provided Irwin with 1099B forms that were identified as a "substitute statement" and did not resemble 1099B forms that Irwin had seen in the past. From 2002 through 2007, Forte did not provide Irwin with any supporting documentation at all. The absence of standard third party confirmatory statements – either from the bank where Forte purported to have deposited some of the Partnership's assets or the brokerage firm which Forte purported to use to effectuate his trades – should have alerted

- 15 -

Irwin and Jacklin that Forte was reporting fraudulent earnings.

75.    Irwin, as President of Jacklin, wrote to Lind-Waldock & Company regarding

Forte's commodity trading account and explicitly stated that Jacklin did not want to receive

"statements of trading activity in Joseph Forte's account." See Letter from John N. Irwin to

Lind-Waldock & Co. dated May 10, 2001 (produced from Irwin's files and assigned bates

number JI 4718) (attached hereto as Exhibit N). As the sole person preparing the financial

statements and tax returns of the Partnership, Irwin was reckless in specifically declining the

opportunity to receive copies of the statements of trading activity in Forte's account.

76.    While a fund prospectus Irwin sent to an investor in 1999 highlighted the fact that

the Partnership was limited to 30 investors, by the end of the first quarter of 2001, the

Partnership had more than 30 investors.

77.    Irwin knew, should have known, or recklessly disregarded the fact that he and

Forte had not filed registration or exemption papers for the Partnership as required of a common

pool fund constituted, managed, and organized as the Partnership was.

78.    In soliciting investors in the Partnership and after receiving either their investment

money or their executed Limited Partnership Agreements, or both, Irwin did not send the new

investors, and never received from the investors, a standard Accredited Investor Questionnaire.

79.    Irwin did not disclose to limited partners that Jacklin was receiving a percentage

of Forte's fees. Therefore, many of the limited partners did not know that the person preparing

the Partnership's financial statements and tax filings was not independent and indeed, to the

contrary, was financially motivated to have the Partnership consistently report profits.

80.    Irwin was aware that the Partnership had never been audited. Irwin discussed an

audit with Forte; and Forte told Irwin that an audit was not practical because of his trading

methodology. Forte's resistance to having the Partnership audited should have alerted Irwin and Jacklin to the Ponzi scheme.

81.    Irwin, through Jacklin, employed apprentices who Forte said were being trained to run the fund based on Forte's investment system. Nonetheless, the apprentices were unable to obtain returns on investments similar to those reported by Forte. Irwin, as the apprentices' employer, knew, should have known, or recklessly disregarded the fact that the apprentices could not duplicate Forte's success with Forte's own trading methods.

82.    At least one of the apprentices discussed his inability to duplicate Forte's results with a limited partner at Irwin's and Jacklin's holiday party in or before December 2007.

83.    Irwin was aware that the transfers of Partnership assets which Jacklin received from Forte did not correspond with the funds due to Jacklin as determined by the quarterly schedules prepared by Irwin.

84.    Irwin was aware that Forte's record keeping regarding deposits, completed withdrawals, and requests for withdrawal was informal and frequently erroneous. These haphazard recordkeeping practices should have alerted Irwin and Jacklin to the Ponzi scheme. For example, on April 22, 2005, Irwin wrote to investors ##1032 and 1052 explaining accounting errors made by the Partnership. See Correction of Joseph Forte LP Statements dated Apr. 22, 2005 (produced from Irwin's files and assigned bates number JI 4592) (attached hereto in redacted form as Exhibit O).

85.    In April 2008, the Partnership sent checks to the IRS and others for limited partners that were returned for insufficient funds. Irwin was aware that these checks were returned for insufficient funds. In light of the reported size of the Partnership – purportedly over $100 million – the unavailability of funds to pay these checks should have alerted Irwin and

Jacklin to the Ponzi scheme.

86.    On November 18, 2008, Irwin wrote an email to Forte in which Irwin

acknowledged his awareness of the Partnership's lack of available funds.  Specifically, in the

email Irwin stated that he would delay depositing a check for "payroll" if Forte did "not have the

funds yet available."  In addition, presumably referencing the Partnership's difficulty meeting its

obligations, Irwin stated that, "I have collected almost $5,000 of my money and with others I

now have about $6,000."  Irwin went on to say that, "[h]opefully we will get a lot on Thursday,"

and that "I guess we need about $15,000 altogether to pay the bill."  See Email from John N.

Irwin to Joseph Forte dated Nov. 18, 2008 (assigned bates number J.F. PROD 1976) (attached

hereto as Exhibit P).  In light of the reported size of the Partnership – purportedly over $100

million – these statements of Irwin concerning the Partnership's need to obtain additional funds

in order to pay its bills demonstrate that Irwin and Jacklin knew or recklessly failed to know that

the assets reported in the Partnership statements were illusory.

87.    Despite Irwin's awareness of the insolvency of the Partnership and thus the

fraudulent scheme, Irwin continued to, solicit, receive and accept investments from limited

partners.

88.    The Ponzi scheme succeeded in recruiting investors and remaining undiscovered

because of Irwin and Jacklin's assistance to Forte and Irwin's conduct in willfully ignoring,

recklessly disregarding, or casting a blind eye on the numerous signs that indicated Forte was

running a Ponzi scheme.

## IRWIN BREACHED THE FIDCUIARY DUTIES HE OWED TO THE PARTNERSHIP

89.    Through, among other things, his preparation of fraudulent account statements for

limited partners of the Partnership; his management of Partnership accounting through Jacklin;

his role as an agent for the Partnership; his solicitation of investments in the Partnership; his

receipt and processing of investments in the Partnership; his arranging for and delivering

withdrawals from the Partnership; his communication with limited partners regarding fund

performance; and his employment, through Jacklin, of Forte's apprentices, Irwin acted as an alter

ego of the General Partner of the Partnership and thereby became a de facto General Partner of

the Partnership.

90.    Because Irwin was a de facto General Partner of Joseph Forte, L.P., Irwin owed a

fiduciary duty to the Partnership.

**91.**    Irwin breached his fiduciary duty to the Partnership by, among other things,

ignoring Partnership procedures when fulfilling limited partner redemption requests, making

errors in the recording of limited partner deposits and withdrawals, preparing account statements

and tax filings for the limited partners without sufficient documentation, failing to have the

Partnership examined by an outside auditor, failing to engage independent managers for the

Partnership's operations, and willfully ignoring, recklessly disregarding, or casting a blind eye

upon numerous red flags that should have alerted him to the Ponzi scheme.

## IRWIN'S DEBT TO THE RECEIVER AROSE FROM HIS MISCONDUCT

92.    Irwin's violation of his obligations to the Partnership, including, among other

things, his material misrepresentations to the Partnership, his willful failure to meet his

obligations to the Partnership,  and his breach of his fiduciary duties to the Partnership, were the

proximate cause of substantial damages and irreparable harm suffered by the Partnership in an

amount in excess of $34 million, including, but not limited to, the loss of Partnership assets that

were fraudulently diverted by Forte, Irwin, and Jacklin.

## IRWIN RECEIVED WINDFALL PROFITS ON HIS INVESTMENTS
## IN THE PARTNERSHIP

93.     In addition to providing the only accounting services for the Partnership,

recruiting investments in the Partnership, being a primary contact for limited partners, and acting

as an alter ego for the General Partner, Irwin also invested his personal assets in the Partnership.

Irwin received windfall profits on his investments and had a financial interest in the continuance

of the fraudulent scheme.

94.     Irwin became a limited partner through the first offering when the Partnership was

formed, investing $25,000.

95.     Over the life of the Partnership, Irwin contributed $1,275,114 in cash and

$1,018,500 in intrafund transfers to his personal Partnership account (as distinguished, for

example, from the Partnership accounts for his IRA or the Irwin Irrevocable Trust).  He received

$1,880,000 in cash from the Partnership and transferred an additional $1,175,000 from his

personal Limited Partnership account to other Limited Partnership accounts.  By the time the

Partnership activities were suspended, Irwin personally received net winnings of $715,615 from

his personal Limited Partner account.

96.     Irwin received Partnership assets through checks from Forte's personal checking

account in the amount of $51,265.

97.     Irwin directed investments to the Partnership from Investor # 1120 (a profit-

sharing plan of which he was trustee) in the amount of $259,000.  Irwin subsequently cashed in

Investor # 1120's limited partnership interest for $587,525, a profit of $328,525 on the original

investment.  Irwin personally received more than $300,000 of that distribution.

98.     From 1995 through 2008, Forte fraudulently transferred approximately $11

million to Jacklin.  This included a percentage of management and incentive fees reported to the

limited partners as going to Forte.

99.    In addition to the personal windfall that Irwin received from the Ponzi scheme, he

directed Forte's investment in several closely held businesses, thus providing these businesses

with Ponzi scheme proceeds.

### JACKLIN RECEIVED PARTNERSHIP ASSETS

100.    Through the Ponzi scheme, approximately $25,640,177 of limited partners'

investments were looted from the Partnership.  Approximately $11 million of this amount was

transferred from the Partnership to Jacklin – a corporation of which Irwin was president and

majority shareholder – through checks written by Forte.

### FIRST CAUSE OF ACTION
### NON-DISCHARGEABILITY OF DEBTS UNDER
### 11 U.S.C. § 523(a)(2), (a)(4), (a)(6), and (a)(19)

101.    Plaintiff Receiver incorporates by reference the allegations contained in

paragraphs 1 to 100 of this Complaint as if fully rewritten herein.

102.    Irwin's debt to the Receiver is non-dischargeable pursuant to 11 U.S.C. §

523(a)(2) because it arose from false representations and actual fraud or arose from materially

false written misrepresentations regarding his own or an insider's financial condition in that,

among other things:

a.    Irwin made material misrepresentations to the Partnership of facts that he

knew were at the time were false, including, among others, misrepresentations in the quarterly

and annual statements prepared for the Partnership and the limited partners; misrepresentations

in the tax documents he prepared for the Partnership, limited partners, and the Internal Revenue

Service; and the willful, intentional, or knowing repetition of Forte's fraudulent earnings

statements to the Partnership, limited partners, and the Internal Revenue Service through the tax

forms that Irwin prepared for the Partnership.

      b.    Irwin made these misrepresentations with the intent and purpose of deceiving, among others, the Partnership in order to obtain money or other property from the Partnership.

      c.    The Partnership justifiably relied on Irwin's mispresentations in that, among other things, it relied upon the mispresentations in making payments to limited partners, providing (fraudulent) tax forms to the limited partners, and transmitting (fraudulent) account statements to limited partners.

      d.    Moreover, certain of Irwin's misrepresentations – including but not limited to the Partnership tax documents he prepared relating to his own income as a limited partner and, to the extent that Irwin is found to be the de facto General Partner of the Partnership, the documents he prepared relating to the Partnership or limited partners' financial condition – constituted written and materially false representations of his own or an insider's financial condition, upon which the Partnership reasonably relied, and that Irwin published with the intent to deceive.

      e.    Irwin's false representations proximately caused losses or damages to the Partnership including, but not limited to, the loss of Partnership assets that were fraudulently diverted by Forte, Irwin, and Jacklin.

103.    Irwin's debt to the Receiver is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) because it arose from Irwin's fraud or defalcation while acting in a fiduciary capacity or from larceny in that, among other things:

a.    Irwin was a fiduciary of the Partnership in that he acted as the alter ego of the Partnership's General Partner, by, among other things, making numerous and significant managerial decisions on behalf of the Partnership, thereby becoming a de facto General Partner of the Partnership.

b.    While acting in his fiduciary capacity, Irwin committed fraud, including by making knowing misrepresentations, including, among others, misrepresentations in the quarterly and annual statements prepared for the Partnership and the limited partners, misrepresentations in the tax documents he prepared for the Partnership, limited partners, and the Internal Revenue Service, and the willful, intentional, or knowing repetition of Forte's fraudulent earnings statements to the Partnership, limited partners, and the Internal Revenue Service through the tax forms that Irwin prepared for the Partnership.

c.    The Partnership justifiably relied upon the misrepresentations that Irwin made in his fiduciary capacity.

d.    Irwin's false representations in his fiduciary capacity constituted fraud and proximately caused losses or damages to the Partnership including, but not limited to, the loss of Partnership assets that were fraudulently diverted by Forte, Irwin, and Jacklin.

e.    Irwin's conduct in his fiduciary capacity also constituted a defalcation in his capacity as a fiduciary in that, among other things, he willfully, intentionally, knowingly, or recklessly made misrepresentations to the Partnership and others regarding the Partnership's finances; intentionally, knowingly, or recklessly repeated Forte's fraudulent earnings statements; recklessly failed to discover the misrepresentations made by Forte regarding the investment of and use of Partnership assets; recklessly aided Forte in the creation and operation of his fraud;

- 23 -

recklessly aided Forte in his breaches of his own fiduciary duties to the Partnership; and took and accepted money and other assets belonging to the Partnership without disclosing to the entire Partnership that he was taking these assets and without obtaining the Partnership's legitimate consent.

f.      Irwin's defalcations in his fiduciary capacity proximately caused losses or damages to the Partnership including, but not limited to, the loss of Partnership assets that were fraudulently diverted by Forte, Irwin, and Jacklin.

g.      Irwin misappropriated the Partnership's funds, either directly or through Jacklin, for his own benefit and with fraudulent intent.

104.    Irwin's debt to the Receiver is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6) because it arose from willful and malicious injury to another entity or the property of another entity pursuant to 11 U.S.C. § 523(a)(6) in that, among other things:

a.      Irwin engaged in deliberate actions that were substantially certain to produce harm to the Partnership and its limited partners in that those actions were intended to support, sustain, and prolong the ongoing Ponzi scheme.

b.      Irwin's deliberate actions included, but were not limited to, his repeated intentional misrepresentations regarding the Partnership's financial condition in, among other materials, account statements and tax documents; his willful ignorance of the numerous signs that indicated that Forte was running a Ponzi scheme; his solicitation of investors for the Partnership; and his continuing acceptance of additional investments from limited partners.

c.      Irwin's actions were malicious in that, among other things, they were done

- 24 -

without any just cause or excuse, were tortious, and/or were intended to harm the Partnership and its limited partners.

105.    Irwin's debt to the Receiver is non-dischargeable pursuant to 11 U.S.C. § 523(a)(19) because it arose from common law fraud, deceit, or manipulation in connection with the purchase or sale of any security in that, among other things:

a.    The complaint in the SEC's action against Forte and the Partnership, *SEC v. Forte et al.*, 09-cv-0063 (E.D. Pa.), alleged that the Partnership was formed for the purpose of investing in "securities futures" and that defendants Forte and the Partnership violated Section 17(a) Securities Act of 1933, 15 U.S.C. § 77(q)(a), Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  On September 30, 2009, the District Court entered a Partial Final Judgment As To All Defendants that, among other things, enjoined Forte and the Partnership from violating securities laws and ordering them to disgorge ill-gotten gains pursuant to the Securities Act and the Securities and Exchange Act.

b.    The complaint in the CFTC's action against Forte, *CFTC v. Forte*, 09-cv-0063 (E.D. Pa.), alleged that Forte violated sections 4b(a)(2), 4b(a)(1), 4o(1), and 4m(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6b(a)(2), 4b(a)(1), 6o(1), and 6m(1).  On September 30, 2009, the District Court entered a Consent Order of Permanent Injunction and Other Equitable Relief Against Defendant Against Joseph S. Forte that, among other things, enjoined Forte from trading in commodity futures or having commodity futures or related instruments traded on his behalf, enjoined Forte from controlling or directing the trading of commodity futures or related instruments on behalf of any other person, and ordered Forte to pay restitution.

c.    The Partnership, which was operated from 1995 through 2008 as a Ponzi

Scheme through which investors – who purchased limited partnership shares that were securities interests in the Partnership – were defrauded out of approximately $34 Million, had the stated purpose of investing in securities futures.

d.    Irwin's misconduct with respect to Forte and the Partnership was therefore fraud, deceit, and/or manipulation in connection with the purchase of sale of securities.

e.    For example, Forte and Irwin used fraudulent documents prepared by Irwin to promote the Partnership and to recruit new investors in the Partnership.

f.    Irwin's fraudulent, deceitful, or manipulative actions that served to further the Ponzi scheme included, among others:  aiding Forte in the creation and operation of his fraud; making misrepresentations regarding the Partnership's finances; repeating Forte's fraudulent earnings statements; and soliciting potential investors to purchase limited partnership shares in the Partnership.

g.    Also, while acting as a de facto General Partner of the Partnership, Irwin committed fraud, including by making knowing misrepresentations, including, among others, misrepresentations in the quarterly and annual statements prepared for the Partnership and the limited partners, misrepresentations in the tax documents he prepared for the Partnership, limited partners, and the Internal Revenue Service, and the willful, intentional, or knowing repetition of Forte's fraudulent earnings statements to the Partnership, limited partners, and the Internal Revenue Service through the tax forms that Irwin prepared for the Partnership.

h.    Irwin's debt to the Receiver, which includes the loss of Partnership assets that were fraudulently diverted by Forte, Irwin, and Jacklin, therefore arose from his fraud,

deceit, and or manipulation in connection with the purchase of sale of securities.

WHEREFORE, Plaintiff Receiver respectfully demands a judgment that the debts owed

her by Defendant Irwin are not dischargeable, as well as for any costs of suit, and fees and costs

as may be authorized by law or otherwise, and such other and further relief as the Court deems

just and proper.


August 27, 2010                          ___s/ George P. Podolin_____
                                         Lawrence T. Hoyle, Jr., PA Attorney I.D. 2926
                                         Arlene Fickler, PA Attorney I.D. 20327
                                         George P. Podolin, PA Attorney ID 84894
                                         Benjamin H. Field, PA Attorney ID 204569
                                         HOYLE, FICKLER, HERSCHEL & MATHES, LLP
                                         One South Broad Street, Suite 1500
                                         Philadelphia, PA 19107
                                         (215) 981-5700
                                         (215) 981-5959 (fax)

                                         Attorneys for Marion A. Hecht, as
                                         Receiver for Joseph Forte, L.P.